675 A.2d 611

THE BOARD OF EDUCATION OF THE TOWNSHIP OF NEPTUNE IN THE COUNTY OF MONMOUTH, PETITIONER–APPELLANT, v. THE NEPTUNE TOWNSHIP EDUCATION ASSOCIATION AND THE NEPTUNE TOWNSHIP PRINCIPALS ASSOCIATION, RESPONDENTS–RESPONDENTS.

Argued February 14, 1996—Decided May 8, 1996.

*James T. Hundley* argued the cause for appellant (*Hundley, Parry & Hopkins,* attorneys).

*Stephen B. Hunter* argued the cause for respondent Neptune Township Education Association (*Klausner, Hunter & Seid,* attorneys; *Lawrence J. Van Wess,* on the brief).

*Wayne J. Oppito* argued the cause for respondent The Neptune Township Principals Association.

*Robert H. Stoloff,* Assistant Attorney General, argued the cause for respondent New Jersey State Board of Education (*Deborah T. Poritz,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel; *Arlene Goldfus Lutz,* Deputy Attorney General, on the brief).

*Kim Chapman,* Associate Counsel argued the cause for amicus curiae New Jersey School Boards Association (*Susan E. Galante,* Director, Legal Department, attorney).

*Kathleen A. Naprstek* argued the cause for amicus curiae New Jersey Education Association (*Zazzali, Zazzali, Fagella & Nowak,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

The sole issue in this appeal is whether, after the expiration of a three-year collective bargaining agreement (CBA), *N.J.S.A.* 18A:29–4.1 prohibits a board of education from paying to its teaching staff salary increments set forth in the expired CBA.

I

On September 14, 1988, the Neptune Board of Education (the Board) entered into a three-year contract, effective July 1, 1988 and ending June 30, 1991, with the Neptune Education Association (NEA). Similar three-year agreements were reached with the Neptune Principals Association (NPA) and the Custodians' Association. Currently, the custodians are also represented by the NEA. Each contract contained various salary guides providing for increments in pay as employees gained additional years of service. The contract also stated that both sides "expressly understood that [the contract] shall expire on the date indicated," July 1, 1991.

As the expiration of the contract approached, NEA and NPA (collectively, the unions) and the Board were unable to agree on a new contract. On June 28, 1991, NEA's counsel sent a letter to the Board informing it that NEA would institute suit on July 1 if the Board did not move those employees represented by the NEA to the next step on the expired salary guides. Despite the fact that the salary guides were part of the expired negotiated agreements, the Board complied. On July 1, all the employees who were not already at the top of a salary guide were moved to the next step of their respective salary guides. Their salaries were adjusted accordingly.

Although it complied with the unions' request, the Board also filed a petition with the Commissioner of Education seeking a declaratory judgment that it was prohibited by *N.J.S.A.* 18A:29–4.1 from paying salary increments required under the expired contracts. The Board contended that it could not pay increments because that would result in extending the binding nature of the schedule for a fourth year, beyond the mandate of the statute. In

November 1991, the Board reached agreement with the NPA, and in February 1992 with the NEA, on new three-year contracts.

After preliminary proceedings, not here relevant, the Commissioner of Education (the Commissioner) referred the matter to the Office of Administrative Law. The Administrative Law Judge (ALJ) ruled for the Board. He decided that *N.J.S.A.* 18A:29–4.1 preempted labor law and prohibited the Board from paying salary increments beyond the date of the contract. That statute originally mandated that contracts be binding for two years, but it had been amended in 1987 to allow contracts to be binding for one, two or three years. The ALJ, therefore, reasoned that the statute prohibited the Board from following the contract's terms beyond the end of that period and extending them to a fourth year.

The Commissioner reversed, holding that the education statutes did not dispose of the issue raised. The Commissioner essentially concluded that *N.J.S.A.* 18A:29–4.1 as now in effect neither prohibits nor mandates the payment of salary increments set forth in salary schedules included in a collective negotiations agreement that has expired. Instead she found that the case was controlled by the Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 to – 29, "over which PERC [Public Employment Relations Commission] enjoys exclusive jurisdiction." The Commissioner dismissed the case.

The State Board affirmed substantially for the reasons expressed by the Commissioner. *Board of Educ. v. Neptune Tp. Educ. Ass'n,* 93 *N.J.A.R.*2d 791 (EDU 1993). The Board then appealed to the Appellate Division. The Appellate Division affirmed, based on the Commissioner's opinion, in an unreported *per curiam* opinion. However, because PERC had not participated in this proceeding, the court declined to express an opinion as to whether the issue was within PERC's exclusive jurisdiction.

We granted the Board's petition for certification. 142 *N.J.* 518, 665 *A.*2d 1111 (1995).

22

II

■ The New Jersey Constitution, art. 1, ¶ 19, grants public employees the right to organize and to present grievances and proposals to their employers through their own elected representatives. In 1968, the Legislature enacted *N.J.S.A.* 34:13A–5.1 to – 5.3 as part of the Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 to –29 (the Act), to effectuate this constitutional right. That Act created certain substantive rights and limitations, including a rule against the alteration of existing working terms and conditions. *N.J.S.A.* 34:13A–5.3 provides that "[p]roposed new rules or modifications of existing rules governing working conditions shall be negotiated with the majority representative before they are established." Stated negatively, this rule, known as the prescription against unilateral change of the *status quo,* "prohibit[s] an employer from unilaterally altering the status quo concerning mandatory bargaining topics, whether established by expired contract or by past practice, without first bargaining to impasse." Stephen F. Befort, *Public Sector Bargaining: Fiscal Crisis and Unilateral Change,* 69 *Minn.L.Rev.* 1221, 1268 (1985).

The Act does not define whether the *status quo* should be viewed as static or dynamic; that is, whether it should include previously scheduled salary increments or, instead, freeze the current salaries without increments. While most jurisdictions have ruled that private employers must not change a dynamic *status quo,* there is less unanimity in applying that rule to the public sector. *Compare Indiana Educ. Employment Relations Bd. v. Mill Creek Classroom Teachers Ass'n,* 456 *N.E.*2d 709 (Ind.1983); *Board of Educ. of Springfield Public Sch. Dist. No. 186 v. Springfield Educ. Ass'n,* 47 *Ill.App.*3d 193, 5 *Ill.Dec.* 374, 361 *N.E.*2d 697 (1977); *Cobleskill Cent. Sch. Dist. v. Newman,* 105 *A.D.*2d 564, 481 *N.Y.S.*2d 795 (1984); *California School Employees Ass'n v. Davis Unified School Dist.,* 4 PERC ¶ 11031 (Cal. 1980) (adopting dynamic *status quo* ) *with New Castle County Vocational Tech. Educ. Ass'n v. Board of Educ.,* 451 *A.*2d 1156, 1163–64 (Del.Ch.1982); *Board of Trustees of Univ. of Me. v.*

*Associated Colt Staff of Univ. of Me. System,* 659 *A.*2d 842 (Me.1995); *Appeal of Milton Sch. Dist.,* 137 *N.H.* 240, 625 *A.*2d 1056 (1993); *Fairview Sch. Dist. v. Pennsylvania Unemploy. Comp. Bd. of Review,* 499 *Pa.* 539, 454 *A.*2d 517 (1982) (adopting static *status quo* ). *See generally* Befort, *supra,* 69 *Minn.L.Rev.* at 1273.

The Public Employment Relations Commission has interpreted the Act to require a dynamic *status quo,* including the payment of increments. *See, e.g., Scotch Plains—Fanwood Bd. of Educ.,* 17 *NJPER* ¶ 22082, *aff'd,* 17 *NJPER* ¶ 22149 (1991) ("An employer's refusal to pay automatic salary increments contained in a recently expired contract . . . is a unilateral change of the *status quo* and an unfair practice"); *see also Howell Tp. Bd. of Educ.,* 11 *NJPER* ¶ 16196, *aff'd,* 11 *NJPER* ¶ 16223 (1985); *City of Vineland,* 7 *NJPER* ¶ 12142 (1981); *State of New Jersey,* 7 *NJPER* ¶ 12235 (1981); *Rutgers, the State Univ.,* 5 *NJPER* ¶ 10278 (1979); *Hudson County,* 4 *NJPER* ¶ 4041 (1978).

## III

New Jersey had previously codified its education law in *N.J.S.A.* Title 18A. "Since virtually every aspect of public education is governed by statute, the court had to reconcile conflicts" between Title 18A and the Employer–Employee Relations Act. Gary Carlson, Note, *Public Sector Labor Relations: The New Jersey Supreme Court Interprets the 1974 Amendments to the Employer–Employee Relations Act,* 32 *Rutgers L.Rev.* 62, 67 (1979). Generally, the Act and Title 18A, the education statute, are *"in pari materia* and should be construed together 'as the unitary and harmonious whole.'" *Red Bank Bd. of Educ. v. Warrington,* 138 *N.J.Super.* 564, 569, 351 *A.*2d 778 (App.Div.1976); *Board of Educ. v. Rockaway Tp. Educ. Ass'n.,* 120 *N.J.Super.* 564, 569, 295 *A.*2d 380 (Ch.Div.1972). Nonetheless, conflicts do arise between the two statutory schemes and courts then must determine whether the Education Law or Labor Law should be accorded primary importance.

In 1973, we held that Title 18A, the Education Law, preempted the Employer–Employee Act in a case concerning whether the board of education had the authority to consolidate the chairmanships of two departments. We stated:

[I]t is our clear judicial responsibility to give continuing effect to the provisions in our Education Law without, however, frustrating the goals or terms of the Employer–Employee Relations Act. Surely, the Legislature, in adopting the very general terms of [the labor laws] did not contemplate that the local boards of education would or could abdicate their management responsibilities for the local education policies.

[*Dunellen Bd. of Educ. v. Dunellen Educ. Ass'n*, 64 *N.J.* 17, 24–25, 311 *A.*2d 737 (1973) (citations omitted) ].

We pointed to *N.J.S.A.* 34:13A–8.1, which provided that no provision in the labor act shall "annul or modify any statute or statutes of this State." *Id.* at 24, 311 *A.*2d 737.

■ In 1974, the Legislature modified *N.J.S.A.* 34:13A–8.1 to read that no provision shall "annul or modify any *pension* statute or statutes of this State." *L.* 1974, *c.* 123, § 6. Despite the legislative changes, courts have continued to hold that specific education statutes preempt labor law. Thus, in *Galloway Township Bd. of Educ. v. Galloway Township Educ. Ass'n*, 78 *N.J.* 25, 51, 393 *A.*2d 218 (1978), we decided a labor issue by reference to an education statute that "applies to command that conclusion." Similarly, in *Board of Educ. v. Piscataway Maintenance & Custodial Ass'n*, 152 *N.J.Super.* 235, 245, 247–48, 377 *A.*2d 938 (App. Div.1977), the court rejected a claim that the 1974 amendment should change the result in *Dunellen* and decided that "the general provisions of the Employer–Employee Relations Act . . . should yield to specific sections of the Education Law dealing with the subject." *See also Rockaway Tp. Educ. Ass'n., supra*, 120 *N.J.Super.* at 569, 295 *A.*2d 380 ("It cannot be argued, therefore, that *Title* 18A, 'Education,' . . . has been superseded."); *Orlando v. Board of Sch. Estimate*, OAL Dkt no. EDU 4550–83 (Comm'r of Educ., September 6, 1984) ("The salary schedules . . . while they may have been negotiated in good faith [and are valid under labor law], fall outside the clear provisions of [Title 18A] and are of no effect.").

## IV

### N.J.S.A. 18A:29–4.1, as amended in 1987, reads as follows:

A board of education of any district may adopt a one, two or three year salary policy, including salary schedules for all full-time teaching staff members which shall not be less than those required by law. Such policy and schedules shall be binding upon the adopting board and upon all future boards in the same district for a period of one, two or three years from the effective date of such policy but shall not prohibit the payment of salaries higher than those required by such policy or schedules nor the subsequent adoption of policies or schedules providing for higher salaries, increments or adjustments.

[*N.J.S.A.* 18A:29–4.1] [1]

The statute originally required two-year schedules, but it was amended in 1987 to provide flexibility and allow for one, two, or three year schedules.

 Construction of any statute begins with consideration of its plain language. *Merin v. Maglaki,* 126 *N.J.* 430, 434, 599 *A.*2d 1256 (1992). A statute should be interpreted in accordance with its plain meaning if it is "clear and unambiguous on its face and admits of only one interpretation." *State v. Butler,* 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982). *N.J.S.A.* 18A:29–4.1, written in the imperative, states that contracts shall be binding for a maximum of three years. Education law requires that teaching staff members shall not be "reduced in compensation except for inefficiency, incapacity, or conduct unbecoming such a teaching staff member...." *N.J.S.A.* 18A:28–5. *See also N.J.S.A.* 18A:17–1 to –3 (applying same rule for secretaries, clerical workers and janitors). Once an increment pursuant to a salary schedule "accrue[s]," those tenure rules apply to it and render it "beyond recall."

---

[1] The statute defines "teaching staff member" to mean "a member of the professional staff of any district or regional board of education, or any board of education of a county vocational school, holding office, position or employment of such character that the qualifications, for such office, position or employment, require him to hold a valid and effective standard, provisional or emergency certificate, appropriate to his office, position or employment, issued by the state board of examiners and includes a school nurse." *N.J.S.A.* 18A:1–1. *N.J.A.C.* 6:11–3.1 to –11.20 lists several positions that require certification including teachers and principals.

*Greenway v. Board of Educ.*, 129 *N.J.L.* 461, 464, 29 *A.*2d 890 (E & A 1942). Increments accrue, or vest, "contractually and becom[e] operative in the various stages of time spaced by the schedule." *Weber v. Board of Educ.*, 127 *N.J.L.* 279, 286, 21 *A.*2d 808 (E & A 1941).

The language of *N.J.S.A.* 18A:29-4.1 indicates that the Legislature intended to provide that no contract will be binding beyond the third year. If the Board is required to grant increments pursuant to the expired contract, the tenure rules will render those increments "beyond recall." Hence, the contract will be "binding" for a fourth year, beyond the statutory-prescribed mandate.

The unions, however, offer a different "plain meaning" of the statute. They argue that there is no evidence to suggest that 18A:29-4.1 was intended to be applied as a limitation on otherwise prevailing laws governing collective bargaining. That section was simply intended to limit the length of the contract, not the length of the terms and conditions of employment.

We reject that argument. The statutory reading offered by the unions does not comport with *N.J.S.A.* 18A:29-4.1's plain meaning. Whether called a contract or terms and conditions of employment, the result of paying increments after the third year is that the provisions of the contract become binding for a fourth year. Under the plain language of that statute, the binding nature of the contract cannot extend into the fourth year.

The Oklahoma Supreme Court, in *City of Tulsa v. Public Employees Relations Bd.*, 845 *P.*2d 872 (Okla.1990) reached a similar conclusion. When Tulsa refused to pay merit increases to its police officers pursuant to an expired contract, the state labor board applied a dynamic *status quo* rationale and found that that was an unfair labor practice. *Id.* at 876–77. The city pointed to a state constitutional provision that denied it the power to extend contracts beyond one year. *Id.* at 877. The Oklahoma Supreme Court agreed and held that "the Board's ... adoption of the

'dynamic status quo' principle serves to extend the provisions of the contract beyond one year. Our reading of the Constitution of this state simply tells us that a city's contract is not valid if it constitutes a charge against municipal funds beyond the fiscal year." *Id.* at 878. Similarly, any payment of increments here, after the expiration of the three-year contract, violates the plain meaning of *N.J.S.A.* 18A:29–4.1.

## V

The Legislature's purpose in enacting *N.J.S.A.* 18A:29–4.1 also supports that interpretation. Before that statute was enacted, the Legislature had not authorized school boards to bind future boards, and " 'it was not uncommon in the give-and-take of annual budget-making for boards of education to reduce salary schedules after their adoption by the board but before final approval' by governing bodies." *Probst v. Board of Educ.,* 127 *N.J.* 518, 526, 606 *A.*2d 345 (1992) (citing *Newark Teachers Ass'n v. Board of Educ.,* 108 *N.J.Super.* 34, 49, 259 *A.*2d 742 (Law Div.1969), *aff'd,* 57 *N.J.* 100, 270 *A.*2d 14 (1970)). "Section 4.1 therefore was designed to prevent local boards from using the budget process to avoid salary schedules they had already agreed to in collective-bargaining negotiations. . . ." *Ibid.; accord Sponsor's Statement to Senate Bill No. 248* (1965). Essentially, in 1965, the Legislature, to protect teachers, granted a limited power to boards to bind future boards. However, that power was limited to two years; thus, in *Orlando, supra,* the Commissioner voided the third year of a schedule because the board was not conferred with power pursuant to *N.J.S.A.* 18A:29–4.1 to bind its successors that far in the future. While section 4.1 was amended to overrule *Orlando,* it still limits the school board's authority to a maximum of three years. Because the Legislature has never explicitly authorized the Board to adopt schedules beyond the term of *N.J.S.A.* 18A:29–4.1, reading that statute to prohibit the contract from being binding for more than three years supports that principle of limited board power.

## VI

The Court's reading of the statute is not only in accord with its plain meaning and the Legislature's purpose in enacting that statute, but is supported by public policy. As we observed, *supra* at 26, 675 *A.*2d at 616, any increments granted become binding pursuant to the tenure statute. Thus, the practice of automatically paying an increment will limit a board's ability to respond to ever-changing economic conditions of the district. Schools that need to cut budget growth will face serious problems. Teachers will have a reduced incentive to agree to a new CBA. Indeed, teachers may resist negotiating and wait for the more generous increments that will accrue under the expired CBA. Those teachers who have received increments under the old schedule will obtain a larger share of a shrinking pie. The New York Court of Appeals, in ruling that a board need not pay increments (a decision later reversed by statute), recognized that problem:

[I]n times of escalating costs and diminishing tax bases, many public employers simply may not be able in good faith to continue to pay automatic increments.... In times either of inflation or depression, employees, quite naturally, will be reluctant to accept abolition of automatic increments which they have been receiving. To the extent that it provides that such increments must be paid even after expiration of contract, the proposition gives an edge and makes negotiation of that point that much more difficult.

> *Board of Coop. Educ. Serv. v. New York Pub. Employment Relations Bd.*, 41 *N.Y.*2d 753, 395 *N.Y.S.*2d 439, 443, 363 *N.E.*2d 1174, 1177–78 (1977).

This state's education policies, including those established in *Abbott v. Burke*, 136 *N.J.* 444, 643 *A.*2d 575 (1994), and in the Quality Education Act of 1990, offer further support for the Board's assertion that schools not be required to pay increments pursuant to expired contracts. *Abbott v. Burke* required that school spending be equalized. The legislative response has been to increase spending in special needs districts while limiting spending in wealthier districts. *See N.J.S.A.* 18A:7D–1 to –37 (Quality Educ. Act of 1990). That cap on school spending, along with declining state aid, means that many school boards will need to slow down the rate of growth in budgets. By enacting *N.J.S.A.* 18A:29–4.1, the Legislature intended to allow schools to properly

manage their budgets in conformance with the New Jersey Constitution and current economic realities.

Moreover, by specifically providing in that statute for the prohibition of increments beyond three years, the Legislature signalled its intention that *N.J.S.A.* 18A:29–4.1 preempt any conflicting general rule of labor law. *See Piscataway Maintenance & Custodial Ass'n, supra,* 152 *N.J.Super.* at 245, 377 *A.2d* 938. Based on the plain language of *N.J.S.A.* 18A:29–4.1, the legislative purpose, and this state's public policies, we find that *N.J.S.A.* 18A:29–4.1 prohibits school boards from paying increments pursuant to expired three year contracts.

## VII

The unions also rely on *Galloway, supra,* 78 *N.J.* 25, 393 *A.2d* 218. In that case we also considered whether a school board was obligated to provide scheduled salary increments pursuant to an expired contract. In *Galloway,* the Galloway Education Association filed an unfair practice charge with PERC against the town school board. A contract had been signed for 1974–75, and it included a schedule of salary increments. When the two sides were unable to reach an agreement on a new contract for 1975–76, the board refused to pay increments pursuant to the expired salary schedule. *Id.* at 29–30, 393 *A.2d* 218. PERC upheld the unfair practice claim, reasoning that "the payment of the scheduled annual salary increment was one of the existing terms and conditions of employment" and required to preserve the *status quo* under labor law. *Id.* at 50, 393 *A.2d* 218. On appeal, the Court considered whether a refusal to pay increments violated a "dynamic" *status quo* and, hence, the rule against unilateral changes in work conditions, or was proper to maintain a "static" *status quo. Id.* at 49–51, 393 *A.2d* 218.

Ultimately, however, the Court concluded:

We need not consider the general issue of whether the terms and conditions of employment which prevailed under a previous collective agreement constitute the *status quo* after its expiration because in this case a specific statute applies to

command that conclusion with respect to the payment of increments according to the salary schedule. By entering into the 1974–75 collective agreement with the Association, the Board adopted the salary schedule contained therein. *N.J.S.A.* 18A:29–4.1 authorizes boards of education to adopt salary schedules for its full-time teachers and further provides:

> 'Such policy and schedules shall be binding upon the adopting board and all future boards in the same district for a period of two years from the effective date of such policy but shall not prohibit the payment of salaries higher than those required by such policy or schedule ...'

Pursuant to this statute, the salary schedule adopted by the Board in 1974 for the 1974–75 school year was binding upon it for the 1975–76 school year or until the schedule was modified as provided in the statute. [Fn.] The language of *N.J.S.A.* 18A:29–4.1 is mandatory and binds a board of education to the terms of the salary schedule for the two year period. . . .

As a matter of statutory compulsion, the payment of the scheduled increments for the 1975–76 school year constituted an element of the *status quo.*

[*Id.* at 52–53, 393 *A.2d* 218.]

The language in *Galloway* clearly states that the Court reached its decision because *N.J.S.A.* 18A:29–4.1 made all salary schedules binding for a two-year period.

In 1987, the Legislature amended *N.J.S.A.* 18A:29–4.1 (*L.* 1987, c. 123, § 1) to read as follows: "A board of education of any district may adopt a *one, two or three* year salary policy, including salary schedules for all full-time teaching staff members...." Furthermore, "such policy and schedules shall be binding upon the adopting board and upon all future boards in the same district for a period of *one, two or three* years from the effective date, but shall not prohibit the payment of salaries higher than those required by such policy or schedules...." (emphasis added) The Assembly, Senate, and Governor all indicated that the new language would provide flexibility and "give[ ] a board the option of adopting or negotiating a three year salary schedule." Assembly Education Committee, *Statement to Assembly No. 2045* (May 22, 1986); Office of the Governor, *News Release* (May 20, 1987); Senate Education Committee, *Statement to Assembly No. 2045* (October 27, 1986).

The statutory changes reveal no indication of any intent to overrule *Galloway,* but the simple change in language automatical-

ly precludes the application of *Galloway* to this case. Because the statute no longer binds a board to a salary schedule for a set period of time, "statutory compulsion" no longer provides an answer to the question in *Galloway*. Moreover, *Galloway* would not apply here because the schedule has already been effective for three years, and the unions seek to bind it for a fourth year. *See Romanoli v. Board of Educ.*, 1984 *N.J.Sch.L. Decisions* 2678, 2680 (State Bd. of Educ. 1984) (finding "nothing in [the original version of] *N.J.S.A.* 18A:29–4.1 that confers an entitlement under the education laws to receive salary benefits beyond the two year statutory period," the Commissioner denied a superintendent salary increment pursuant to his expired two-year individual contract).

The unions, however, contend that *Galloway* did not simply apply *N.J.S.A.* 18A:29–4.1 to require the grant of salary increments, but rather was grounded in labor law. They cite to several PERC cases in which the agency determined that increments were required to be paid, as a matter of labor law, and cited *Galloway*. In *Hudson County, supra,* 4 *NJPER* at 90–91, PERC ordered the county to pay increments to police officers, citing the Appellate Division in *Galloway*. Then, in *City of Vineland, supra,* PERC cited *Galloway* and *Hudson County* to announce that "it is well settled that when a labor relations contract expires, no alteration in the provision of the agreement may be tentatively altered by the employer.... This rule has been applied to the withholding of salary increments." 7 *NJPER* at 325. In *State of New Jersey, supra,* PERC enjoined the State and ordered it to pay increments to communication workers, citing *Galloway, Hudson County,* and *Vineland.*

Generally, courts accord substantial deference to the interpretation given to a statute by the agency charged with enforcing that statute. *Merin, supra,* 126 *N.J.* at 436–37, 599 *A.2d* 1256. But "[a]n appellate tribunal is, however, in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." *Mayflower Sec. Co. v. Bureau of Sec.,* 64 *N.J.* 85, 93, 312 *A.2d* 497 (1973). To hold that *Galloway* would permit

or require the payment of increments beyond the three-year expired contract pursuant to the Employer–Employee Relations Act is a misinterpretation of that decision. *Galloway* was not decided on the basis of the Act, but on the Court's interpretation of *N.J.S.A.* 18:29–4.1. Moreover, the Court held in *Galloway* that the Education Law preempted the Act.

## VIII

The Board asserts that the Legislature's enactment of the Teachers Quality Employment Act (TQEA) in 1985 and its concomitant repeal of *N.J.S.A.* 18A:29–8, which had provided for automatic salary increases for all teachers, indicates the Legislature's disfavor of automatic pay increases. We reject that argument.

New Jersey introduced a statutory minimum salary for teachers in 1919, *L.* 1919, *c.* 181, but the statute did not contemplate increments for those teachers with additional education or experience. In 1954, New Jersey changed its approach and enacted a statutory minimum salary schedule for teachers, *L.* 1954, *c.* 249. With changes in 1957, (*L.* 1957, *c.* 153), and 1963, (*L.* 1963, *c.* 164), the statute set out a minimum salary and provided for increments as teachers gained additional years of employment. *N.J.S.A.* 18A:29–7 (repealed 1985) set out a salary schedule, and *N.J.S.A.* 18A:29–8 (repealed 1985) provided that "[a]ny teacher holding office, position, or employment in any school district of this state shall be entitled annually to an employment increment until he shall have reached the maximum salary provided in the appropriate training level column in section 2 of this act." Finally, the statute provided that "the schedule set forth in this act is intended to proscribe a minimum salary at each step, and any increment prescribed shall also be considered a minimum." *N.J.S.A.* 18A:29–12 (repealed 1985). However, "[b]oards of education shall have the power to increase for any teacher ... the initial salary or the amount of any increment or the number of increments." *Ibid.*

In 1985, the Legislature passed the TQEA, *N.J.S.A.* 18A:29–5.1 to –5.12, (*L.*1985, *c.* 321), as a replacement for those salary rules. The Legislature declared that "starting salary levels for new teachers have fallen significantly behind ... other recent college graduates," and it wished to remedy this situation in order to improve schools. *N.J.S.A.* 18A:29–5.2. The act amended *N.J.S.A.* 18A:29–5 to set a new minimum salary at $18,500. At the same time, *N.J.S.A.* 18A:29–5.5 was enacted, which actually forbids certain mandatory salary increments.

The TQEA was adopted in response to falling salaries and to the fact that the existing schedule had fallen so far behind inflation. The statute was simply a baseline intrusion into the collective bargaining process, with an intent to leave remaining issues to the negotiating table. The bill's sponsors contemplated that "[t]eaching staff salaries above the $18,500 level would be established by local districts under the provisions of the 'New Jersey Employer–Employee Relations Act.'" *Sponsor's Statement to Assembly No. 634* (1983). Additionally, the Governor vetoed language found in the original version providing for increases in the minimum salary due to inflation because "the State should avoid a permanent intrusion into the collective bargaining process." Letter from Gov. Thomas Kean to the New Jersey Assembly, (August 28, 1985). Thus, both the Assembly and Governor stated their desire to limit the intrusion into collective bargaining and thus only set a minimum salary, leaving the rest to negotiations.

IX

Tenure statutes prohibit the Board from reducing a teacher's compensation. Therefore, allowing the increment under the expired three year CBA would render such an increase permanent and binding for a fourth year and each year of tenure thereafter. Accordingly, *N.J.S.A.* 18A:29–4.1 prohibits the Board from paying increments on the expired contract because that would make the contract binding for a fourth year, beyond the statutory term.

That conclusion is supported by the plain language of *N.J.S.A.* 18A:29–4.1, its legislative purpose and public policy.

We observe, however, that *N.J.S.A.* 18A:29–4.1 applies only to "teaching staff members." As mentioned *supra* at 25, 675 *A.*2d at 615, the statute defines them to include those who are required to be licensed to hold their position. To the extent that any of the litigants in this case are not "teaching staff members," then the prohibition against increments in *N.J.S.A.* 18A:29–4.1 does not apply. Contracts with those employees should be governed by labor law only since no education law preempts that general rule.

We therefore reverse the Appellate Division's judgment as it applies to teaching staff members, and affirm it as it applies to other employees.

*For reversal in part and for affirmance in part*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.